Case is number 14-1469, The Medicines Company v. Hospira, Inc. Please, the Court, good afternoon. The central issue on appeal here is the claim construction from the District Court. A number of errors, we believe, were made. First, the District Supposing we agree with you on the Court's claim construction on efficient mixing, and that it's incorrect. If we adopt your construction, is there a way to determine whether a particular mixing scenario has minimized the ASP9 by Valrhodin levels before the batch is made? Because the patentee seems to say, well, you do it by testing afterwards. The patentee does say, you test what you get afterwards, for sure, in its examples. But he's asked, can you do it before? And he says, I don't know. Before this invention, I think that's absolutely correct. You don't know. That, in essence, was the problem that they were solving, is that they had variable results when they were using the processes that they had been using, and then they recognized that, for reasons unknown, at the time, they got ASP9 levels, impurity levels, that were too high. They were beyond the specifications that were approved by the FDA. And so then, when they looked at the problem, that's exactly what the inventors did. They solved that problem by finding out what was going on and also realizing that a maximum ASP9 level, namely up to about 0.6, made a new and different product, and one that satisfied the specifications. And they figured out how to do it by looking at the processes and experimenting, and that's all set forth in the specifications. Why wouldn't, under your construction, efficient mixing be indefinite? In the sense that you're saying, first of all, that you don't have to know it in advance, and second of all, you say, all it means is minimizing the levels. And I don't understand how minimizing the levels can be sufficiently definite. Well, first of all, with hindsight, once the inventors made their invention, as described in the specification, they explained, first of all, that the process even had any significance to maintaining the impurity level of the ASP9. No, but how can it be definite to say minimizing the levels? How is that sufficiently definite? How does that give anybody any guidance as to what the number is? Well, the guidance is, well, first of all, I don't think the test for infringement necessarily, it's not the same as the test for indefiniteness. I think there's a clear boundary here for indefiniteness. I think it's the Starlight case. There's a clear boundary here. It's .6 or below. There are other limitations in the claim also that have to be followed, wherein the... Well, sure, but the fact that some limitations are comprehensible doesn't mean that others may not be. I don't think there are any limitations in Claim 1 of the 727 patent or the 343 patent that are incomprehensible of understanding where the bright line is. What do you think in the 343 that efficient mixing means? I'm sorry. What do you think in the 343 is the definition of efficient mixing? It is characterized, as it says in the specifications, defined as characterized by maintaining an ASP9 level below or above or below about .6. That's how you know if you have efficient mixing. And when you're observing it, you don't have precipitate, you don't have... That was the problem with the prior art. They were getting precipitates in the process and so on and so forth. But as far as... It's when you characterize it, you know you have an ASP9 level, and also it's the definition of pharmaceutical batches in this claim where there is no dispute. A pharmaceutical batch is either a single batch that is representative of future batches or multiple batches all made by the same compounding process. And the issue here is the court here went further and said the same compounding process means exactly this. And then they imported these limitations into the claims. And I don't think this invention is in any way limited to how you do it as in example 5. That's an example of one way to do it and a good example. But efficiently mixing clearly to a person of ordinary skill in the art is a way to get to your point, you know, to your ASP9 level and maintain that either with one batch that's representative of multiple batches such as the case here as found by the district court or in multiple batches using the same process which is what... We are competitors in the industry that has been found. Right, right. Absolutely, because the harm is going to us as a competitor from not participating in the distribution. All right, but if you weren't competitors, you really wouldn't be able to raise the retroactivity. We wouldn't be able to and we wouldn't have standing to. Like if we had not participated in the anti-dumping review. That's fine, that's fine. Okay, I mean, unlike, for example, conceivably an equal protection argument in which you wouldn't have to be competitors. Correct. My next question is, in your reply brief, you rely on Zobel against Williams and you rely on it for a broad proposition as you characterize it and I want to test how broad that proposition is in your view. I think you say that the court and Zobel have that rewarding citizens for past actions is not a legitimate state purpose. Now, do you assert that that's always the case, that rewarding citizens for past actions is not a legitimate state purpose? That's what you've said and I just want to see if you really stand by that. Well, we stand by it in that situation because of the… In that situation being the situation in Zobel? Zobel, yeah, which we analogize to it. Let me give you an example. You wouldn't say that if Congress decided that the veterans who had fought in the Iraq war should get some kind of benefits that that would be an impermissible state purpose to award them benefits even though it would be expressly for past action. I think it would depend on what the context of what the statute was.  Because… How about the GI Bill of Rights? I'll give you a specific statute. After World War II, Congress decided people who had fought in the war, thank you very much. Your reward is you are going to get educational benefits. No constitutional problem, you would think. No constitutional problem. Okay, how about this situation? How about if a veteran… Congress says veterans will get competitive advantage in federal employment so that they get 10 points extra on their civil service exams over you and me, and you and I are competing with those veterans for a job, but the veteran's getting an extra 10 points and the veteran gets the job. Do we have a retroactivity argument of the sort that you're making here? I think it depends on what the purpose of the statute is. The purpose is to reward those veterans, to reward those veterans for having served in Iraq. I don't think there's any problem rewarding them from serving in Iraq. The problem would be, and what we're saying here, and I believe what Zobel says, is that the purpose of the law was to do something subsequent. We are doing something subsequent. We're giving them benefits in employment for something that they did long ago, and that you and I are denied the equal benefit. And we could say, as your clients say here, we didn't know that you were going to end up making it more difficult for us to get federal employment simply because we didn't join the Iraq war. I'm having a hard time seeing why it's a different case. I think it's slightly different. Here you have a statute that applies across the board to all anti-dumping investigations or cases regardless of the particular product involved. In your situation, I think you're talking about a specific subset of a group of people who were participating as veterans in a war, but it's not necessarily applicable to all situations in which there might be... If their participation allowed discrimination against other people later in a broader context, I think that's what we're trying to get. And what I'm trying to say is the anti-dumping law applies to everyone, to all businesses who have exported or imported to the United States. And when you are providing an incentive to a recognized part of the industry, the domestic industry, which has to have been, in fact, was considered in the ITC injury investigation and whether you would then impose anti-dumping duties, when you take a subset of that imperative group of companies to make the initial decision and then you take out a segment of it based on what that segment did earlier and benefit that segment so drastically, as is done in the bearing industry, that that is a retroactive application of the law. It should not place... And I don't know how to do it, but I don't think your situation is the same as this situation because here we're starting with the big... You had not raised that issue, correct? We... I think we raised the issue. There was a... We raised the issue that... Relief... Relief... And therefore, we're not commercial... Because of what that segment did and benefit them greater than the bigger group. I would have to look at the record as to whether or not we specifically said experimental use or we were just arguing that these were not commercial batches. Namely, they were experimental because they were made for purposes of satisfying FDA requirements. I don't remember if we specified it as experimental use. So the sole issue is whether, because they were used to meet FDA requirements, whether that made it an experimental use. No, it's not... Well, on experimental duties, that's a... It's a regulatory process. Customs publishes the notice, gives parties 60 days to file their certification and go forward. In this situation, the government is relying on DICTA in the SKF USA case about when the two-year statute period actually begins to run. In addition to the continuing claims theory, we believe that that was not a decision of this court in when it comes. You focus on the publication of the Federal Register notice giving parties the 60 days in which to file their certifications. At the time of that publication, there was no guarantee or even any knowledge whether parties would be subject to... be able to receive distributions in that fiscal year period. That only is known after the certifications come in and the actual distributions of funds are actually made. Let me see if I... Oh, go ahead. And I'm just saying, under that scenario, we probably wouldn't have a two-year period. Let me see if I understand the mechanics of that system by which the determination is made as to who's eligible. First, there is, I guess, by regulation, a list that's sent out, findings that give everybody 60 days, or at least an announcement that gives everybody 60 days to say, I'm... Yes. Commercial. And they were designated for commercial... They were, in fact, sold later. And they were, in fact, sold. However, again, critical to what Keith says, is that if you do something for FDA purposes, that constitutes an experimental use. What case says that? I don't know. I think... I'm not sure there's any specific case on that. I don't think there's a case either. I don't know if there's a case right on that. I really don't. But, again, I would like to make the point on sale bar. BDL never sold anything, ever. Right? They only made these products and they issued invoices and the documents in the file here and the testimony shows clearly... But BDL sold it to you, right? No, they never sold it to the medicines company. They only charged for their services in manufacturing a product. That's what they charged for. They never took title. They never had title. They never bought... And your complaint, and let's just take the easy one, which is the one that is more confusing because there were two complaints. But the one complaint case, the SKF case, your complaint was filed within two years of the rejection letter? No. Within two years of the date that payments actually will go out to the parties who were determined... But not within two years  No. Okay, so you had a final notice from the agency that you weren't going to get paid as of the time the rejection letter was sent. And what's the date of that rejection letter? Well, it has to be... I don't know the exact... It has to be by the end of the 60-day period. Well, no, it's usually... The 60-day period typically ends like the end of September, I believe, and then distributions have to be made by the end of October or maybe it's a month later. I don't remember exactly, but it's towards the end of that period because it's done on a fiscal year basis, which is October 1st. And so each year this period is the government's fiscal year. But you did not file within two years of the rejection letter itself. We did not, but we would argue that that's not the criteria because the criteria is when everyone... We were not hurt by our being rejected at that time when we received the rejection letter. We were hurt when our competitors received their additional funds. And that does not happen until the end of the fiscal year period. So the harm to us does not come from our not being accepted. The harm to us comes from our competitors receiving the funds. Mr. Shelley, you're into your rebuttal time, but we'll give you your requested three minutes back. Mr. Tomlinson, and you're going to take eight minutes. Thank you, Your Honor. Martin Tomlinson from the United States. I'd like to, if I could, just pick up quickly on that point on the timeliness issue. Mr. Shelley characterized our reliance on the SKF case as reliance upon DICTA in the SKF case. We strongly dispute that. The actual language of the SKF case on the timeliness issue was, quote, we hold that the filing of SKF's complaint was timely in any event because the cause of action did not accrue until June 1st, 2005. And June 1st, 2005 was the date upon which CBP published its list of who these ADPs are that would receive distributions. Clarify for me the difference between the publication of the list and the opportunity that the, those who were not on the list have to request inclusion in the final distribution and the notification, if I understood what Mr. Shelley was saying, a notification to those people who make such application that indeed they are not going to be included. Is that, in fact, the way you understand the way the scheme works? Your Honor, I'll give you my understanding if Mr. Gallagher from ITC will be up here momentarily, he can correct me if I'm wrong. My understanding is... Well, it's pretty important potentially. It is, Your Honor. ITC prepares the list. A producer submits something to ITC asking to be put on the list. ITC prepares the list, lets you know if you're not on the list, and then you have an opportunity to follow up with them. At that point, if ITC decides you're still not on the list, they forward that list to CBP. All potential ADPs and even some people who are not on the ITC list file certifications with CBP to be on the final published list of who will receive distribution, and then CBP publishes that list. But then somebody gets a letter like SKF would get a letter saying thank you for your application. It is denied. Not from CBP. I'll let Mr. Gallagher who speaks it... I believe there's a letter from ITC, but CBP does not simply notify you that you are not on the list, but you certify that you're supposed to be on the list, then the list is published, and if your name is not on that list, which again is published and available to you, you know that you are not on the final list of ADPs who will receive distribution. And when do you think the statute of limitations, when do you think the cause of action accrues at the point at which the first list comes out? The point at which the CBP list comes out. And the point at which the last list comes out. That's correct. The final one after you have since gotten your letter saying, sorry, you're not on our list. That's correct. And that was the holding of this court in SKF. And here that happened on June 2nd, 2004. Neither of the two complaints at issue for fiscal year 2004 were filed until September 2006, which is outside the two-year statute. Your Honors, I'd also like to... If I could just keep going on this, do you think this two-year statute of limitations is jurisdictional? Yes, Your Honor. That's our understanding of it. Now this affects only either one or two of the multiple claims that are before us, correct? That's correct. So it would not dispose of the entire case in any event. But on the face of it, it doesn't... I mean, when we look at some of the recent Supreme Court cases like Henderson, you know, which seem to be really telling all of us that these sorts of statute of limitations to be jurisdictional, there has to be a very clear, strong intent from Congress to make it so. And this one, I mean, it's part of the chapter entitled procedure, not the one governing jurisdiction. Is that right? I believe that is correct, Your Honor. So isn't that a trait that seems to lean against deeming this one jurisdictional? Potentially, Your Honor. But I do think it's important to note that plaintiffs' appellants have not raised any tolling or any equitable tolling or any arguments along those lines. Well, no, but the question for us is whether we can even reach the merits of this issue if it is jurisdictional. We presumably can't with respect at least to the particular claims that are at issue. That's correct, Your Honor. On the... So you say that it... I mean, that therefore whether it's jurisdictional or not in nature really does matter. That's correct. Put it another way. We can't... We couldn't... Assuming we were prepared to affirm on the merits with respect at least to the issues that are covered by the statute of limitations questions, we couldn't say we don't need to address those because we can go directly to the merits. If it's not jurisdictional, that's correct. If it is jurisdictional, we couldn't... Right. We could not simply pass to the merits. That's correct. Right. And that's your position. That's the government's position. Yes, Your Honor. I'd like to briefly address... I see I'm running close on my time, but I'd like to briefly discuss the Zobel versus Williams case that Mr. Shelley discussed. I think it's very important to note that the appellants read a lot into that case in terms of its relevance to this case. I think it's distinguishable on many different grounds. First of all, as Your Honor noted, it was an equal protection case, not a due process case. But furthermore, I think it's very important to note that that case wasn't strictly a retroactivity case. The Supreme Court noted at page 59 of that opinion that the distinction they complain of is not one which the state makes between those who arrived in Alaska after the enactment of the dividend distribution law and those who were residents prior to its enactment. The distinction that was being challenged there was essentially sort of, in a way, levels of retroactivity. How long you'd lived there. Exactly. How long you had been a citizen post-statehood. But the real question and the point that Mr. Shelley is making by raising that case, I think, is the language that the court used was directed to what constitutes a rational basis for legislative action. And as to that question, which cuts across equal protection and retroactivity, the court does make a pretty broad statement that the objective in this case, the objective of rewarding past activities is not a legitimate state purpose. That is pretty sweeping, at least taken in isolation. It is, Your Honor, but there's several points I'd like to make on that. First of all, the test that this court is called upon to apply here today is whether this is rationally related to a legitimate governmental purpose. The holding of the Zobel case was that there was no legitimate governmental purpose to this law. What they held was there's just no legitimate purpose that's being served by making these arbitrary distinctions based purely on basically how long you lived somewhere. It wasn't, Your Honor, throughout several hypotheticals regarding veterans and past actions, that there was no actions being rewarded there. It was simply being alive and being in Alaska. And so the holding of the court was there's no legitimate governmental purpose and that's separate from whether it's rationally related and I think the importance of this case is we know that there's a legitimate governmental purpose to the CDSOA and the reason we know that is because this court held that there was a legitimate governmental purpose to the CDSOA in SKF and that legitimate governmental purpose was to reward domestic producers who had provided assistance to the IPC in its anti-dumping duty investigation. So the question is purely whether it's rationally related. We know that the CDSOA as a whole is rationally related because again this court held that it was in SKF and so the question is just whether this retroactive spur is rationally related and I see that I'm out of time so if the court has no further questions. You are unfortunately when you divide up your time, time flies. Thank you, Your Honor. Mr. Gallagher, for the commission. And you've got four minutes. Thank you. Good morning, Your Honor. Patrick Gallagher on behalf of the International Trade Commission. Just to clarify something that you asked about, Judge Bryson, about how it all works. Yes, the mechanics of this distribution. In 2000 the commission was required to take all the existing orders and create a list. Right. That's part of the statute. 60 days. Created the list, provided it to customs. That's you call it the master list, you call it whatever you want. The customs would use that to then determine when parties applied for disbursements under a particular order for a particular fiscal year. If you're on the list and they publish this, they put this in their initial publication of that first list that if you have any debate about whether you should be on this list because you're not, then you should go to the commission because the commission makes that determination, not CBP. We argued in FKF that that was the time, the first time that a list is published for an order that the statute of limitations would begin to run. Now that's the when you say the list is published for the order. Which list? The list. Not the master list. The list that's provided to customs. The master list. The next fiscal year, the next fiscal year, they'll publish it in the federal register. Here it is. Here's the orders. Here are the parties who are eligible. Here's the criteria for eligibility. Okay, so suppose I'm not on that list but I think I should be. Then I write the commission. I say, please put me on the list. Yes. And the commission then what, writes me back? Yeah. Or issues another list or whatever. No, issues of determination based on whatever you're claiming. Okay. And then they send me a letter. They send me a letter say, sorry, you're not eligible. Yes. Is it that letter that is the point of accrual of the cause of action? We argued that in SKF. The SKF court said no, it comes later. All right. Because, as I understand, SKF, because there is no, they can't know whether there are duties available to them until they apply to CBP. So, whatever the first fiscal year that they first apply, for the duties, CBP is not going to find them on the list. It's going to say, you're not on the list, you're rejected. If you have an issue with that, you should talk to the commission. Right. If we've already issued a decision letter to them, we'll just say, you haven't presented any new facts, which goes to the continuation of the land stock. Then, CBP does what it does. It issues another list, right? It will deny the distribution to whoever that party was, and then they move on to the next fiscal year. Okay, and you say SKF identifies that denial as the point at which there is accrual, at least at the earliest. Yes. So, the time the claim first accrues is the first time that a party requests a disbursement under the statute, or under the particular fiscal year, under a particular fiscal year, and that's denied. That's our reading of SKF. We had an earlier date, and the court didn't agree with that. All right. And that goes to Judge Shen's question about continuing claims. SKF posits that every single year we have a new claim, a new claim, a new claim, except their claim they're bringing here is that they should be a petition supporter, not that they were denied in a particular year necessarily. They're saying because you need, as a prerequisite, to be a petition supporter to qualify. That only happens once for us, for the Commission, absent some unusual circumstance. We make that decision once, and they'll be rejected. The first time they'll be rejected will be the first time they ask. Do you have a final statement to make, Gallagher? I was going to quote to incentivize, Your Honor, but I think that would take a little longer. Thank you. Mr. Stewart has three minutes. Your Honor, please accord. I'm Terrence Stewart. I'm here on behalf of Timpkin and MPB. There were some factual errors in terms of what Mr. Shelley had to say in terms of the timing that you could tell. The order of 1989 CDSOA came into existence in 2000. That's an 11-year spread, not a 20-year spread, as it was mentioned. On the Zobel case, that case was viewed by the Supreme Court as involving a very important constitutional right, freedom of movement. And Hanson was a much higher standard that was applied in terms of looking at whether there was a compelling state interest in putting an infringement on the ability of the freedom of movement that was there. So while the language is error in the context of the case, in our view, it's not a relevant case for a new process. Because I don't think the SOL issue is critical, but because there's some confusion, let me try my hand at providing you what in fact the SKF case does, and what in fact the June 4 decision is. Mr. Gallagher has reviewed the initial list, and when there are letters that are sent to the Commission and rejections, exceptions, et cetera, that happens. And that is all true. The Federal Circuit's decision in SKF goes off of the CBP decision or initial listing. By statute, CBP is required to provide notice to the public that there will be a distribution, and CBP puts out information as to amounts that have been collected in the first seven months ahead of putting out that notice. The Federal Circuit, as I read the decision, basically says the time at which all facts are known so that one could file is when a party knows that there will be money to be distributed in the year, not the first year that they apply, but rather is there money in a particular year that's going to be distributed.  the date that the court went, that's the date that is in the SKF decision, and that is the date that Customs puts out its notice that there will be distribution. And that occurs, I take it from what everyone has said, if I'm understanding it correctly, after the SKF   send a letter to the Commission or to CBP, and say you've left me out. At that point that has already been denied. It is viewed by Customs that if they have not gotten an affirmative statement from the Commission they are not on the list. They do not get a letter from Customs at some point saying you're not on the list, you're not eligible. And that at some point will be before distributions occur. Before distributions, but is it after that June date? That's what I'm concerned about. It is after that date, but it is viewed I believe by Customs as a proforma. If you're not on the list and they haven't received word from the Commission that you should be added to the list then you will be rejected. And you're sending in a certification to preserve your rights to take an appeal, but it's not that there is a new factual data at some point that's going to come along, oh I got rejected, gee that's a surprise. Yeah, when though does the trained by complaining party get some confidence? I cannot think of a principled way to distinguish that case from the facts of this case. And with that I thank the committee.